UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                      :

UNITED STATES OF AMERICA             :

                                        :         12 Cr. 409 (PAE)

                 -v-                     :

                                          :         OPINION & ORDER

JAMES PETERSON,                   :

                                        :

                           Defendant.     :

                                        :

------------------------------------------------------------------------X


PAUL A. ENGELMAYER, District Judge:

     Shortly after 4 am on February 20, 2012, two officers from the New York City Police Department ("NYPD") stopped defendant James Peterson ("Peterson") after a 911 caller reported that a man matching Peterson's description, following an altercation, had returned to the area with a gun. After the police stopped Peterson, they frisked him, found a loaded Taurus 9-millimeter handgun in his waistband, and arrested him. Peterson was later indicted as a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).

     Peterson now moves to suppress the gun, claiming that it was seized in violation of the Fourth Amendment. Specifically, he argues that the portion of the 911 caller's tip communicated to the police officers who stopped him lacked sufficient indicia of reliability to justify the stop and frisk under the governing standard of reasonable suspicion. For the following reasons, Peterson's motion is denied.

**I.**     **Procedural History**

     On May 22, 2012, a grand jury returned a one-count indictment against Peterson, charging a violation of 18 U.S.C. § 922(g). Dkt. 3.

On July 19, 2012, Peterson moved to suppress the gun, on the grounds that it was the fruit of an unlawful stop and frisk. Dkt. 8–10. On August 8, 2012, the government filed a response. Dkt. 12. On August 17, 2012, Peterson filed a reply. Dkt. 13.

On August 23, 2012, the Court held a telephone conference with the parties to discuss the suppression hearing scheduled for August 28, 2012.[1]

On August 28, 2012, the Court held a suppression hearing, and heard argument, on this motion. On September 10, and September 21, 2012, respectively, Peterson and the government filed supplemental briefs. Dkt. 16, 18. On September 26, 2012, Peterson filed a response to the government's supplemental brief. Dkt. 21.

## II.      Findings of Fact

The facts found by the Court are based on the evidence adduced at the suppression hearing. On a suppression motion, the government bears the burden of proof by a preponderance of the evidence. *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010). This evidence consisted of the testimony of the two NYPD officers present at the stop and frisk of Peterson, Ariel Marte and Michael O'Connor; and two tapes (GX-1A and GX-1B), which together capture a series of telephone calls in the early morning hours of February 20, 2012. The first tape (GX-1B) records a call by a civilian ("the 911 Caller") to a civilian 911 operator ("the 911 Operator"). The second tape (GX-1A) records the ensuing "radio run," which consists of a series of communications involving the NYPD radio dispatcher ("the Police Dispatcher") whom the 911 Operator contacted immediately after speaking with the 911 Caller. The first transmission in the radio run is the critical one for purposes of this decision. In it, the Police

---

[1] During that call, the Court requested letters with supplemental authority on two discrete legal issues. The parties submitted those letters on August 27 and 28, 2012. Dkt 19, 20.

Dispatcher synopsizes the 911 call to Officers Marte and O'Connor. That synopsis formed the basis of the officers' decision to stop and frisk Peterson.

## A. The 911 Call

Shortly after 4 am on February 20, 2012, the NYPD received a 911 call. The 911 Caller told the 911 Operator that he "got into an altercation with this guy" and that, although he had not seen a gun, he believed that "[the guy] got a gun now" and that the man had said he was "coming back with a gun." GX-1B. The caller stated that the man was black, and had a "black du rag on, black coat on . . . he's dressed in all black now." *Id.* The caller also stated that the man was in front of the caller's apartment building, which the caller identified as 739 East 182nd Street. *Id.* The caller gave the 911 Operator his name, address (including apartment number), and telephone number. *Id.*

## B. The Police Dispatcher's Call to Officers Marte and O'Connor

The 911 Operator then relayed the information to the Police Dispatcher. The Police Dispatcher, in turn, radioed Officers Marte and O'Connor. The two officers were on patrol in the area in a marked vehicle at that time. Tr. 10–11, 32.[2] Officer Marte was driving; Officer O'Connor was in the passenger seat. *Id.* at 11, 32–33. The following conversation ensued:

> **Dispatcher**: Dispute with a firearm. 739 East 182, 739 East 182 Clinton and Prospect. Male caller states male's in front of the location with a gun on him. He didn't visually see the gun, but the person said he had one. Male black, du rag, black coat, wearing all black. The complainant is in apartment [redacted] on the [redacted] floor.[3]

---

[2] "Tr." refers to the transcript of the August 26, 2012 suppression hearing.

[3] The recordings of the 911 call and NYPD "radio run" were provided to the defendant with the caller's name, address, and phone number redacted. The Court has listened to the unredacted tapes *in camera*. These tapes confirm that the caller did provide his name, phone number, and apartment number to the 911 operator. The apartment number was articulated as a number followed by a letter.

**Officer**: [Unintelligible].

**Dispatcher**: 10-4.

**Officer**: [Unintelligible].

**Dispatcher**: 10-4. [Unintelligible]. Checking the call [unintelligible] to see if he's still in front, stand by one.

GX-1A.

## C. Ensuing Communications Involving the Police Dispatcher

The Police Dispatcher then attempted to connect directly with the 911 Caller to confirm

the information. The following call ensued:

**Operator**: [Dialing].

**Caller**: Hello?

**Dispatch**: Yeah, New York City Police Department. Did you call police sir?

**Caller**: Yes I did.

**Dispatch**: Is the guy still in front of the building now? Can you see him?

**Caller**: I hope so. [Unintelligible]. My baby momma talking about that he left and I [unintelligible].

**Dispatch**: Hold on, hold on, can you look out of the window to see if you still see him?

**Caller**: Uhh, nah I can't see the door.

**Dispatch**: Alright, well who actually saw him, you did? Or your…

**Caller**: Yeah, I did.

**Dispatch**: So what happened? He told you he got a gun. He never pulled it out?

**Caller**: No he never told me. He never told me he had a gun.

**Dispatch**: Alright so.

> **Caller**: [Unintelligible]. But they are pullin' him over now. They pullin' him over now.
>
> **Dispatch**: But why did you said he had a gun?
>
> **Caller**: They pullin' him over now.
>
> **Dispatch**: Alright, I'm the dispatcher, I'm talking to them. Why did you say he had a gun then?
>
> **Caller**: Because he, we got into an altercation and now he came back and I'm a little worried. I said he might got a gun. I didn't say like he had a gun.
>
> **Dispatch**: Alright, do you want to talk to the police downstairs?

*Id.*

The Police Dispatcher then attempted to relay the substance of his call with the 911 Caller to the officers on the scene:

> **Dispatch**: [Unintelligible]. Be advised that I just spoke to the complainant, he says that he never saw a gun. Now he's saying that the perp never pulled out a gun. He's saying the perp *may* have a gun. [Unintelligible] that.

*Id.*

### D. Findings of Fact as to Which Radio Communications the Officers Heard

It is undisputed, and the Court finds, that the statements, as excerpted in §§ II.B–C, above, were made by the speakers indicated. The central factual issue in dispute at the suppression hearing in this case is how much of the foregoing statements were heard by the arresting officers, Marte and O'Connor, before they stopped and frisked Peterson. For purposes of analysis, three distinct issues are presented.

### 1. Did the officers hear the entire first paragraph attributed to the Police Dispatcher in § II.B, above?

The government argues that Marte and O'Connor heard the entirety of that paragraph, in which the Police Dispatcher stated:

> Dispute with a firearm. 739 East 182, 739 East 182 Clinton and Prospect. Male caller states male's in front of the location with a gun on him. He didn't visually see the gun, but the person said he had one. Male black, du rag, black coat, wearing all black. The complainant is in apartment [redacted] on the [redacted] floor.

Peterson, in contrast, argues that the officers heard only portions of that paragraph, and did not hear a middle sentence ("He didn't visually see the gun, but the person said he had one") or the last sentence ("The complainant is in apartment [redacted] on the [redacted] floor.")

**2.   Did the officers hear the Police Dispatcher say "Checking the call [unintelligible] to see if he's still in front"?**

Before the suppression hearing, the government also argued that Marte and O'Connor had heard the Police Dispatcher say that he was "checking the call." Gov't Br. 7 & n.3. Although the government has not abandoned this claim, following the hearing, it has not forcefully pursued it. Peterson disputes that the officers heard that statement.

**3.   Did the officers hear any of the ensuing statements on the radio run?**

The hearing also probed whether Marte and O'Connor had heard any ensuing calls on the "radio run," including the Police Dispatcher's (1) follow-up call with the 911 Caller; or (2) attempted communication to the two officers to convey what had been learned on that call. There was, however, no evidence that any of these communications were heard by the two officers, and neither the government nor the defense pursues such a claim.

Based on its review of the hearing testimony and other evidence and its assessment of the competing arguments and inferences urged by the parties, the Court finds that the two officers heard the first radio transmission beginning "[d]ispute with a firearm" and continuing through and including the statement that "[t]he complainant is in apartment [redacted] on the [redacted]

floor." Thus, the officers are fairly chargeable with the knowledge that (1) a male caller had reported a "dispute with a firearm"; (2) the subject of that dispute was presently in front of 739 East 182nd Street; (3) the complainant had not seen the gun, but reported that the subject had one; (4) the subject was male, black and had a "du rag," a black coat, and was "wearing all black"; and (5) the complainant was in an identified apartment number in the same building, 739 East 182nd Street. However, the Court finds that the officers did not hear, and are not fairly chargeable with, any of the ensuing conversations, including the statement by the Police Dispatcher that he was "checking" back with the 911 Caller.

In explaining these factual conclusions, the Court begins by reviewing the testimony of Officers Marte and O'Connor. Officer Marte testified that he recalled receiving a radio dispatch, and recalled hearing the beginning of the first transmission, in which the dispatcher stated that there was a "dispute with a firearm" at East 182nd Street between Clinton and Prospect Avenues. Tr. 18. Officer Marte also recalled hearing the statement at the end of that transmission, in which the subject was described as a "[m]ale black, du rag, black coat, wearing all black." *Id.* at 11, 18, 21, 22. Officer Marte was not questioned about whether he had heard the immediately ensuing sentence, containing the complainant's apartment number. Officer Marte denied having heard the middle sentence in that transmission, in which the Police Dispatcher stated that the complainant "didn't visually see the gun, but the person said he had one." *Id.* at 18–19. Officer Marte stated that immediately after he had heard that there was a dispute with a firearm, and the location, he was focused on driving there as quickly as possible "before something happens." *Id.* at 20.

Officer O'Connor similarly testified that he heard the first transmission from the Police Dispatcher, including the fact of a dispute with a firearm, the subject's location, and the subject's

description.  *Id.* at 33.  Officer O'Connor did not recall whether he had heard the part of the transmission in which the Police Dispatcher stated that the 911 Caller did not visually see the gun but had stated that the suspect had one.  *Id.* at 38.  Like Officer Marte, Officer O'Connor denied having heard the ensuing transmission, in which the Police Dispatcher stated that he was going to "check the call."  *Id.* at 35–36.  As with Officer Marte, Officer O'Connor was not questioned as to whether he had been told the complainant's apartment number.

In light of this testimony, the evidence is compelling that the officers heard the Police Dispatcher's remarks beginning with "Dispute with a firearm" and ending with "Male black, du rag, black coat, wearing all black."  Both officers recalled hearing each of those statements.  The Court therefore comfortably finds that the intervening sentence—to the effect that the 911 Caller had stated that the subject had a gun—was also communicated to and heard by the officers.  That sentence was undeniably transmitted to the officers by the Police Dispatcher, as the tape demonstrates.  And the circumstances to which the officers testified amply explain their lack of recollection of it.  At the time of the hearing, neither had heard any part of the radio run since hearing it "live" on February 20, 2012.  *Id.* at 30, 43.  And each had since received and responded to thousands of additional radio runs.  *Id.* at 9, 32.

It was, further, apparent at the hearing that the two officers retained only a limited recollection of the events of that night, and that the information most important to them during the approximately two minutes between the start of the radio run and the stop and frisk had been that a black male meeting a certain description had a firearm at a particular location.  *Id.* at 18–21, 33–34.  Under these circumstances, and particularly given the existence of the audio tape, the absence of affirmative testimony by either officer that they heard this statement does not mean that that statement was not communicated to, and heard by, them that night.  *See, e.g.*, *United*

*States v. $65,251.99 in Bank Account Funds*, 84 F. App'x 927, 928 (9th Cir. 2003) ("The district court properly denied [the] motion to suppress . . . because probable cause may be supported by hearsay and circumstantial evidence."); *United States v. Daccarett*, 6 F.3d 37, 56 (2d Cir. 1993) ("A finding of probable cause may be based on . . . circumstantial evidence."); *United States v. $208,060*, No. 11-cv-957, 2011 U.S. Dist. LEXIS 123127, at *12 (E.D. Mo. Oct. 25, 2011) (denying motion to suppress based on circumstantial evidence that statements were made consensually); *Pettus v. City of New York*, No. 10-cv-1442, 2011 U.S. Dist. LEXIS 114129, at *25 (E.D.N.Y. Aug. 23, 2011) (citing *Daccarett*, 6 F.3d at 56).

The ensuing sentence from the Police Dispatcher, containing the complainant's apartment number, presents a slightly closer question, because, in the call transcript, it does not come in between statements specifically recalled by an officer, but *after* the last sentence affirmatively recalled by the officers (the subject's description).  However, the Court finds that statement, too, was transmitted to and heard by the two officers.  The apartment location was transmitted immediately—only two additional seconds—after the physical description of the subject.  The officers' testimony was that, upon receiving the dispatch, they remained in the car and sped to the location.  Tr. 18–21, 33–34.  There is no testimony suggesting that the officers had turned off the radio; the tape does not reflect any interruption or transmission hiccup between the moment at which the physical description was conveyed and the moment when the apartment number was communicated; and Peterson has not articulated any reason to infer that the officers were inhibited from hearing that ensuing sentence.  It is, therefore, fair to infer, and the Court does

infer, that the sentence containing the complainant's apartment number was also heard by the officers.[4]

The Court, however, cannot find by the requisite preponderance of the evidence that the officers heard the ensuing transmission, in which the Police Dispatcher stated that he was "checking the call" with the 911 Caller.[5] To be sure, the context of the submission suggests that the two officers were the Police Dispatcher's intended audience for that statement. However, both officers denied having heard any part of that transmission. *Id.* at 24, 40. Further, there are intervening unintelligible noises on the tape, and a passage of some seconds, that provide some basis to infer that transmission may have been interrupted. Having listened closely to the tape, the Court is unable to conclude that any of the noises denoted "unintelligible" emanated from Officer Marte or O'Connor. Even if they had, given the unintelligibility of the sounds coming *from* the officers, there would be no basis to conclude that the Police Dispatcher's words *to* them had been intelligible. Further, the tape reflects no response from either Officer Marte or Officer O'Connor to the Police Dispatcher's statement. There is, therefore, insufficient circumstantial evidence to support a finding that either officer heard the Police Dispatcher's statement that he was "checking the call" with the 911 Caller.

Finally, both officers testified that they did not hear any portion of either the 911 Caller's conversation with the Police Dispatcher, or the Police Dispatcher's attempt to relay the substance

---

[4] Independently, the Court notes that both officers testified repeatedly that they had heard the "location" cited by the 911 Caller—indeed they immediately headed there. *See, e.g.*, Tr. 18, 19, 37, 40. That location, of course, included the 911 Caller's apartment.

[5] This statement would have assisted the government in opposing this motion by permitting an argument that the arresting officers had a sufficient basis to assume the reliability of the 911 caller's complaint, because the statement tends to indicate that the complainant had left with the 911 dispatcher both an address and a telephone number at which to be contacted.

of that call to the officers.  *Id.* at 24, 25, 36.  There is no contrary evidence.  The Court, accordingly, finds that the officers did not hear those transmissions.

### E.  Subsequent Events

The ensuing events are not materially in dispute.  The officers sped by car to the address given to them, using their lights and sirens.  *Id.* at 12, 34.  The officers testified that, upon arrival outside of 739 East 182nd Street, they identified Peterson as matching the description related to them.  *Id.* at 13, 34.  The tape reflects that the officers stopped Peterson approximately 90 seconds after receiving the tip.  GX-1A.[6]  Officer Marte asked Peterson to put his hands where the officers could see them.  *Id.* at 14, 28.  Officer Marte then directed Peterson to the side of the street, and to stand up against a nearby metal gate to be frisked.  *Id.* at 14, 35.  Officer O'Connor stood several yards away surveying the scene.  *Id.* at 41.  In leading Peterson over to the metal gate, Marte put his hand on the small of Peterson's back and felt a hard metallic object in Peterson's waistband.  *Id.* at 14.  Marte then lifted Peterson's shirt and recovered a handgun, whereupon Peterson was arrested.  *Id.* at 15.  The handgun was loaded.  *Id.* at 15.

## III.  Discussion

### A.  The Parties' Contentions

Peterson argues that Officers Marte and O'Connor lacked reasonable suspicion to stop him because the 911 Caller's tip, in the abbreviated form reported to them, lacked sufficient indicia of reliability to create reasonable suspicion.  Peterson likens this case to *Florida v. J.L.*, 529 U.S. 266 (2000), in which the Supreme Court held that a caller's anonymous tip, made from an unknown location, stating that a person of a particular description had a gun lacked sufficient indicia of reliability to justify a stop and frisk.  The Government argues that *J.L.* is inapposite,

---

[6] That is consistent with the officers' recollection that it took them "about a minute" (Tr. 34) or about "20 seconds" (Tr. 12) to arrive on the scene.

because the 911 Caller here gave his name, address, and phone number to the 911 Operator, and because the officers knew at the time of the stop that the 911 Caller had disclosed at least some identifying information about himself (his apartment number). Thus, the Government argues, the call had sufficient indicia of reliability to supply reasonable suspicion.

## B. Analysis

"On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (citing *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004)); *see also United States v. Pena*, 961 F.2d 333, 338–39 (2d Cir. 1992)).

"Under *Terry v. Ohio*, 392 U.S. 1 (1968), police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed and dangerous." *United States v. Elmore*, 482 F.3d 172, 179 (2d Cir. 2007). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or hunch." *Alabama v. White*, 496 U.S. 325, 329–30 (1990) (internal quotation marks omitted). To sustain a stop, police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion [on a citizen's liberty interest]." *Terry*, 392 U.S. at 21. The assessment must be made "through the eyes of a reasonable and cautious police officer on the scene, guided by his [or her] experience and training." *United States v. Colon*, 250 F.3d 130, 134 (2d Cir. 2001) (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)). "[R]easonable suspicion is determined based on the

totality of the circumstances" known to the officers at the time of the stop, *Elmore*, 482 F.3d at 179, and the analysis is objective.  *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008).

Reasonable suspicion may be based on a tip from a confidential or anonymous informant, provided that the tip "bears sufficient 'indicia of reliability.'"  *Elmore*, 482 F.3d at 179 (quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)); *see also United States v. Simmons*, 560 F.3d 98, 104 (2d Cir. 2009).  Such indicia may include that the information came from a reliable source known to the authorities, *see, e.g.*, *Williams*, 407 U.S. at 146–47, or that the substance of the tip is corroborated by subsequent investigation, *see, e.g.*, *White*, 496 U.S. at 332.  As the Second Circuit stated in *Elmore*:

> [I]t is useful to think of known reliability and corroboration as a sliding scale. Where the informant is known from past practice to be reliable, as in *Williams*, no corroboration will be required to support reasonable suspicion.  Where the informant is completely anonymous, as in *White*, a significant amount of corroboration will be required.

482 F.3d at 181; *see also id.* (recognizing that "informants do not all fall into neat categories of known or anonymous").

Applying this principle, the Supreme Court held in *J.L.* that the facts attending the tip in that case fell short of the standard of reasonable suspicion.  529 U.S. at 271–72.  In *J.L.*, the Miami Dade Police Department received a tip that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun."  *Id.* at 268.  Police responded, stopped and frisked a 15-year-old boy matching the tip's description and standing at the bus stop, and recovered a handgun.  *Id.*  However, there was "no audio recording of the tip, and nothing [wa]s known about the informant."  *Id.*  Thus, the police had no basis on which to conclude that the informant was reliable.  Accordingly, in her opinion for the Court, Justice Ginsburg reasoned that the corroboration of the tip in that case—limited solely to the fact that a person at the

identified location matched the description of the subject given by the anonymous caller—did not compensate for the missing indicia of reliability. Put differently, the tip was not corroborated "in its assertion of illegality," but only "in its tendency to identify a determinate person." *Id.* at 272. The Court accordingly held that there had not been a reasonable suspicion of *criminal activity*, and upheld suppression of the gun.

In a fundamental sense, the facts here are a far cry from those of *J.L.*, in that the tipster in this case was not anonymous at all. Rather, the tipster provided his name, phone number, and address to the 911 Operator, as the tape-recording of that call establishes. *See* GX-1B. Thus, unlike the tipster in *J.L.*, the tipster here was quintessentially accountable for the account he gave to the 911 Operator. Were the Fourth Amendment issue framed by the information presented by the tipster to the 911 Operator, the Court would have no difficulty whatsoever finding substantial indicia of reliability, and thus reasonable suspicion sufficient to justify the stop and frisk of Peterson.

The inquiry is, however, complicated, because the information supplied by the 911 Caller differed from (and was substantially more fulsome than) that ultimately supplied to the NYPD officers who stopped and frisked Peterson. In between, the tip passed through two intermediaries—the 911 Operator, and then the Police Dispatcher. By the time the tip reached Officers Marte and O'Connor, the fact that the tipster had given his name and phone number had fallen away. Although Officers Marte and O'Connor were told the substance of the tipster's allegation and his description of the subject, all they were told about the tipster was that he was male, that he had apparently had a dispute with the subject, and that he was in a specific apartment in the building outside of which the subject was situated.

Under the Second Circuit's decision in *United States v. Colon*, 250 F.3d 130 (2d Cir. 2001), only the information conveyed to Officers Marte and O'Connor counts for purposes of determining reasonable suspicion. *Colon* involved an anonymous account given by a tipster (an assault victim) to a civilian 911 Operator. The tipster's account, however, was detailed and had substantial indicia of credibility, and the tipster credibly (and dramatically) set out her history with the assailant as her basis for refusing to give her name. *Id.* at 132. In the abbreviated form conveyed to the officers in the field, however, all those indicia of reliability were removed, and the officers were told only, about the tip as to a "man with a gun," that "it's anonymous." *Id.* The Second Circuit panel, reversing the district court, unanimously held that the stop and frisk of the subject had been unlawful, and that the physical evidence seized, and statements obtained, following the stop were required to be suppressed. The Second Circuit explained that under the collective or imputed knowledge doctrine, all information by law enforcement officials initiating or involved with the investigation was properly considered in assessing reasonable suspicion (or probable cause), but that that doctrine did not extend to a civilian 911 operator lacking law enforcement training, responsibility, and authority. *Id.* at 137.

The government in this case represents that the civilian 911 Operator similarly lacked any law enforcement training, responsibility, or authority. Peterson has not challenged that assertion. Both parties therefore agree that, under *Colon*, the information conveyed to her by the 911 Caller may not be considered except to the extent that it was later conveyed to the two NYPD officers.[7]

---

[7] At the Court's request, the Government investigated the credentials of the Police Dispatcher. The government has represented that the Police Dispatcher is also a civilian, without law enforcement training and authority. *See* Dkt. 18. Accordingly, information known to the Police Dispatcher is also irrelevant to the Fourth Amendment inquiry. In any event, on the record before the Court, it does not appear that the 911 Operator told the Police Dispatcher that the tipster had provided his name and phone number. The Court notes that, in the Police Dispatcher's follow-up call to the 911 Caller, the 911 Caller appeared to retract his earlier

The decisive issue, then, is whether the tip as recounted to the officers had sufficient indicia of reliability to justify the stop of Peterson. The Court concludes that it did. Of central importance, the officers in this case, unlike those in *J.L.,* knew that the 911 Caller had given the authorities his address, including his apartment number. And the building containing the 911 Caller's apartment was the very building to which the 911 Caller had hailed the officers, who were approximately one minute away by police car. Under these circumstances, the officers reasonably could have a fair degree of confidence in the 911 Caller's account, because the Caller was on the scene, at an identifiable apartment number, and could be held to account, then and there, for his statements. Were the caller's claims fabricated—*e.g.*, because the subject had no gun or credibly refuted the 911 Caller's allegations—the officers had a ready opportunity to locate the 911 Caller and hold him responsible. And, under the assembled case law, including *J.L.* and cases long preceding and post-dating it, the reliability of a tip (including to 911) turns, heavily, on the apparent accountability of the caller.

In *Williams*, for example, the Supreme Court found a *Terry* stop permissible on the basis of a known person's unsolicited tip. 407 U.S. at 148. In so ruling, the Court emphasized that the informant "came forward personally to give information that was immediately verifiable at the scene," and "under Connecticut law, the informant might have been subject to immediate arrest for making a false complaint had [the] investigation proved the tip incorrect." *Id.* at 146–47.

---

statement that the subject had told the 911 Caller that he had a gun; the 911 Caller can be heard telling the Police Dispatcher, "[h]e never told me he had a gun." Although under other circumstances that apparent recantation might have negatively affected the 911 Caller's reliability, it does not do so here, because (1) under *Colon*, the knowledge of the Police Dispatcher about the 911 Caller's changed story is irrelevant unless conveyed to the NYPD officers, and the uniform evidence is that they did not hear the Police Dispatcher's ensuing dispatch in which he attempted to convey this; and (2) based on the 911 Caller's statement to the Police Dispatcher that "they are pullin' him over now," it appears that the officers stopped and frisked Peterson before that attempted dispatch was made. *See Colon*, 250 F.3d at 135–36 (relevant inquiry is what was known to the officers at the time of the stop and frisk).

Similarly, in *J.L.*, the Court expressly distinguished the circumstances of that case from those, like *Williams*, in which the tip came "from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated." 529 U.S. at 270. In concurrence, Justice Kennedy illuminated the point: "If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip." *Id.* at 276 (Kennedy, J., concurring). Accordingly, he stated, in light of instant caller identification and advancing recording technologies, "the ability of the police to trace the identity of anonymous telephone informants may be a factor which lends reliability to what, years earlier, might have been considered unreliable anonymous tips." *Id.*

Decisions in this Circuit applying *J.L.* and *Williams* have similarly placed heavy weight, in the reasonable suspicion calculus, on the accountability of the informant. In *Zirlin v. Village of Scarsdale*, 161 F. App'x 100 (2d Cir. 2005) (summ. order), the Second Circuit affirmed the entry of summary judgment against plaintiff's § 1983 complaint challenging, *inter alia*, a *Terry* stop. The stop in that case had been set in motion by a tip from a passing motorist, who told police that she had seen a man in the woods with a knife. *Zirlin*, 161 F. App'x at 101. Invoking *J.L.*, Zirlin argued that the tip lacked sufficient indicia of reliability to support the stop. *Id.* The Circuit disagreed. It noted that "the tipster was not fully anonymous; she remained at the scene after the tip was reported, and when [a responding officer] arrived, she conveyed her tip to him directly." *Id.* True, "the tipster did not identify herself by name," but, the Court concluded, the tip was sufficiently reliable because "she placed herself in a position where she could easily be identified and held accountable for her intervention." *Id.*

Similarly, in *Elmore*, the Second Circuit reversed a district court order suppressing evidence recovered after a *Terry* stop. An informant had telephoned a police officer and offered

her first name, and home and cellular phone numbers. *Elmore*, 482 F.3d at 175. In further conversations with the officer, the informant revealed her full name, and her relationship to the target of the tip. *Id.* The investigating officer confirmed through public records the existence of somebody by the informant's alleged name, and also confirmed the informant's knowledge of non-public information regarding the target of the tip. *Id.* at 175–76. The Circuit found that the district court had erred by analyzing the stop under the "anonymous informant" rubric of *White* and *J.L.* It reasoned that, by giving the police "her name, her relationship with the defendant, and two phone numbers at which she could be contacted," she had provided "the police enough information about herself to allow them to identify her and track her down later to hold her accountable if her tip proved false." *Id.* at 182.

Decisions of district courts in this Circuit, applying *White*, *J.L.*, and *Elmore*, have likewise found the informant's accountability critically important in determining the legality of *Terry* stops. In *United States v. Hayes*, 574 F. Supp. 2d 308, 313 (W.D.N.Y. 2008), the court found an informant's tip insufficiently reliable where police knew only that the tipster was following the target in a black Pontiac Grand Am travelling in the same direction as the target.[8] The district court held that this information failed to sufficiently distinguish the informant from the rest of the population, and that the tip provided only descriptive rather than predictive information. It accordingly suppressed the evidence gleaned from the stop, reasoning that, as in *J.L.*, "[a]ll the police had to go on in this case was the bare report of an unknown, unaccountable

---

[8] The tipster had told the 911 operator his "cell phone number, that the caller was following the defendant's truck in a Black Pontiac Grand Am, and that the caller had had a face-to-face encounter with the police before calling." *Hayes*, 574 F. Supp. 2d at 311. However, the 911 operator did not relay that information to the police dispatcher or the responding officers. Accordingly, under *Colon*, that information could not be considered in the reasonable suspicion calculus.

informant." *Id.* at 313; *see also Ocasio v. Chalker*, No. 05-cv-1249, 2007 U.S. Dist. LEXIS 38309, at *6–7 (D. Conn. May 24, 2007) ("[I]f the informant is identifiable, and the possibility of fabrication can result in criminal liability, the information is usually considered truthful. By contrast, an anonymous informant cannot easily be held accountable for his or her tip." (citing *J.L.*, 529 U.S. at 270)) (internal citation omitted); *United States v. Person*, 134 F. Supp. 2d 517, 527 (E.D.N.Y. 2001) (suppression motion granted where, "[a]lthough the call was traced to a particular [pay phone], the police still did not know the caller's identity, and the person remains unaccountable for her statements"); *cf. United States v. Terry-Crespo*, 356 F.3d 1170, 1174–76 (9th Cir. 2004) (upholding stop where 911 caller supplied name, but not address and phone number, when reporting that he had been threatened by a man with a gun).

Peterson relies on *United States v. Jackson*, No. 10-cr-783, 2011 U.S. Dist. LEXIS 39416 (S.D.N.Y. Apr. 12, 2011), to support suppression. But *Jackson* is distinguishable, and in fact reinforces that where the caller has made himself meaningfully accountable, the standard of reliability is generally met. In *Jackson,* the district court granted a motion to suppress evidence derived from a *Terry* stop based on an anonymous tip. *Id.* at *45. Opposing suppression, the Government relied on the fact that the tipster had agreed to be called back by police at a later time. But, Judge Buchwald held, this did not suffice to make the caller reliable, because the tipster had not provided police with her own phone number, and was reachable only to the extent that the 911 system might have automatically identified the number the caller had dialed from. *Id.* at *4, 32–33. Accordingly, she concluded, "the ability to contact the [c]aller cannot alone provide the indicia of reliability that would convert an anonymous tipster into a more credible and accountable informant." *Id.* at *33.

In this case, by contrast, the caller himself had given out information—his address and apartment number—that enabled the officers to find him, then and there. And, the officers knew, the caller had summoned the police to that very address, where, the caller had stated, the man with a gun was located. Also important, upon arriving at the scene some 90 seconds later, the police found a man (Peterson) in the location and meeting the description that the caller had given. This, in turn, confirmed that the caller who had summoned police was at the scene and in a position to see Peterson, as presumably was the case for a person situated in the apartment that the caller had disclosed. The facts known to Officers Marte and O'Connor would therefore lead a reasonable police officer to conclude that the caller had "put his anonymity at risk," *J.L.*, 529 U.S. at 276, by giving the 911 Operator his address and leading the officers to it.

At argument, Peterson made the additional argument that a caller could conceivably fabricate the information given to identify himself. Tr. 81–82. That is, of course, true, but, as a basis to suppress, Peterson's argument sweeps too broadly: It would logically prevent telephone tips from persons previously unknown to the police from almost ever supplying reasonable suspicion for a *Terry* stop. That is not the law. *See, e.g.*, *United States v. Freeman*, No. 11-cr-567, 2011 U.S. Dist. LEXIS 129257 (S.D.N.Y. Nov. 8, 2011) (Crotty, J.) (denying suppression motion based on telephone tip from identifiable caller). Rather, the veracity of "an identified private citizen informant" is "generally presumed in the absence of circumstances suggesting that they should not be trusted." *Hayes*, 574 F. Supp. 2d at 312 n.5 (citing *Elmore*, 482 F.3d at 180); *see also Caldarola v. Calabrese*, 298 F.3d 156, 165–66 (2d Cir. 2002). In any event, on the facts here, the officers had good reason to assume the veracity of the 911 Caller's statements: Upon reaching the scene, the officers visually confirmed the accuracy of the caller's description of the

subject and the subject's location; this confirmed that the caller was nearby, and thereby tended to corroborate the caller's statement that he was at the address he had given.

The Court, therefore, holds that the address and apartment number which the officers were told had been given by the caller, and which was at the scene to which the officers were being directed, supplied sufficient indicia of reliability to justify the *Terry* stop in this case.

It is, finally, noteworthy that the officers had been told, at the very outset of the dispatch, that the caller had reported "a dispute with a firearm" involving the subject whom the caller described. On the spare facts related to them, the officers could reasonably conclude that the caller thereby was seeking protection from the subject under emergency circumstances. Accordingly, had the police not found Peterson, or had they found him but not had a basis to apprehend him, they reasonably might have followed up by proceeding to the apartment identified by the 911 caller to see if assistance was necessary. This, too, tended to enhance the caller's accountability. And the case law accords special reliability to calls alleging ongoing emergencies. *See Simmons*, 560 F.3d at 105 (holding that "an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of corroboration than a tip that alleges general criminality," and noting that there is a "'special reliability inherent in reports of ongoing emergencies'") (quoting *United States v. Hicks*, 531 F.3d 555, 559 (7th Cir. 2008)); *see also United States v. Houston*, No. 08-cr-457, 2009 U.S. Dist. LEXIS 81914, at *15 (E.D.N.Y. June 5, 2009); *cf. Jackson*, 2011 U.S. Dist. LEXIS 39416, at *27–28 (distinguishing anonymous telephone tip that a person has a gun from a situation where

the caller purports to be in imminent danger).  This fact, too, justified the officers in treating the

tip, as it had been conveyed to them, as credible and reliable.[9]

## CONCLUSION

For the foregoing reasons, the defendant's motion to suppress is denied.  The Clerk of

Court is directed to terminate the motion at docket number 8.

In a separate order issued today, the Court resolves the defendant's other pretrial motions,

relating to discovery.

At the August 26, 2012 hearing, the Court excluded time under the Speedy Trial Act until

October 17, 2012 for the purposes of supplemental briefing and consideration of this motion.

*See* 18 U.S.C. § 3161(h)(1)(D) and (H).  In light of the Court's decision, exclusion of time

pursuant to § 3161(h)(1)(D) and (H) is no longer warranted.

A conference is hereby set for October 4, 2012, at 4:30 pm.  Because the denial of a

suppression motion may alter the defendant's calculus in deciding whether to go to trial or seek a

---

[9] The Court, finally, addresses an argument made in the Government's post-hearing brief, based on the affidavit of Yvette Humphrey, a police communications technician ("Humphrey Aff.") (Dkt. 18-1), submitted with that brief.  Ms. Humphrey attests that "if a 911 complainant wishes to remain anonymous, radio dispatchers are trained to indicate that anonymity to the responding officers.  This indication typically occurs by the radio dispatcher telling the responding officers that the caller wishes to remain anonymous or by referring to the complainant in another way that clearly indicates his or her anonymity."  Humphrey Aff. ¶ 5.  The Government notes that the radio transmission to the officers did not indicate that the complainant wished to remain anonymous.  It argues on that basis that the officers could therefore infer that the complainant had furnished his name.  Gov't Supp. Br. 10–11.  This argument is unpersuasive.  The Humphrey Affidavit appears to be directed to the separate situation in which a caller has given his or her name but asks it to be kept in confidence, in which case the dispatcher is trained to so alert the officers in the field.  It does not address the situation here, in which officers in the field are not told whether or not the complainant has given out their name at all.  Put differently, assuming Officers Marte and O'Connor knew of the practice addressed by Ms. Humphrey, they could not reasonably conclude that the caller had *both* given his name *and* requested that it be kept confidential.  However, they had no way to know whether the caller had or had not given out his name at all.  The Court's ruling does not rely on this argument.

pretrial disposition, the Court finds that exclusion of time, from the date of this Opinion until the next scheduled conference, serves the interests of justice and outweighs the interests of the defendant and the public in a speedy trial. Time is therefore excluded to and including October 4, 2012. *See* 18 U.S.C. § 3161(h)(7)(A).

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: September 28, 2012
New York, New York